Okay, our fourth and last case of the morning, it's still morning, is appeal number 14-1210, Net-A-Dose Enterprises v. Cintron Beverage Group, Mr. Falkowski. May it please the court, Christopher Falkowski appearing on behalf of Net-A-Dose Enterprises. This case is, this appeal is really about two things. One is the proper application of the two-prong judicial test for standing in a TKB opposition, and the second issue being the impact of prosecution history on a standing argument of opposition. None of the cases cited by either party is directly on point here, but I do think that the Ritchie v. Simpson decision is the most illustrative. Before you go into the case block, can we just go a little bit more into the actual harm or injury you believe your client... Yeah, my client has been harmed even, well, because the mark's on a register, but just having filed the mark, the appellee... Your client is not doing any business in the United States, right? Currently, they're doing no business in the United States, that's correct. They don't have a mark here in the United States. Well, they did file an application. After the summary judgment motion, we did file an application for a supplemental register, but it was rejected for obvious reasons. But I do think if I could... I think it's a fair question, but the harm is that, and this gets into some of the prosecution history issues, we're not the ones, my client is not the party that started linking together different parts of the globe and different events and saying, these are all connected. We didn't go to the patent office and say, or the trademark office and say, look, we're... We didn't go to the patent office and lack of acquired distinctiveness saying, well, we've got this global brand all over the place, clearly, we should be able to get a trademark here. I mean, we've got exclusive rights all over the world. We're not the ones who opened up this box of extraterritoriality. My client was in Nigeria, perfectly happy doing what they were doing. But then they got an opposition in Nigeria asserting, hey, that the appellee had US trademarks and they were trying to push them around in Nigeria. And so then my client looked into it and said, hey, they don't even have a registration in the US. But I will get back to all that. I want to frame the issue if I could first. And that is the original... What's the status of that proceeding in Nigeria? Oh, my client prevailed. It's a registered mark in Nigeria. So again, where is the harm? Well, there's other jurisdictions, there's other places where there's fighting, some with my client, some with other African parties in different jurisdictions. But I'm not asking you for sort of general suppositions. I'm asking you for general assumptions. Well, how is this for harm? Where are we... I expect that there will be... Because now that the mark will be registered, I suspect there'll be a cancellation in Nigeria. I mean, they opposed it in Nigeria. They litigated it. That's a fine speculation or... Well, this is... I mean, we're talking about actual assertions... We're talking about a real interest relating to a harm that your client reasonably believes will occur. That's right. That's right. Well, I think there's a couple of different levels of harm. One is the harm of fraud at the trademark office, which I don't want to... I'm not relying exclusively on, but I think that that's not irrelevant here. Well, how does that harm your client? That's what I'm asking. Well, it doesn't... I mean, I guess the question is, and this gets back to the Ritchie case, what is... Different opposition bases have different two-pronged... Essentially, the application of the two-pronged test depends on what basis you're opposing a mark, right? Now, Ritchie went to the GTAB and said, hey, this is a scandalous mark. I'm opposing it. I don't have a commercial interest. Whatever. The GTAB said, you don't have a commercial interest, you don't have standing. This court then said, look, depending on the basis of the opposition, you have a different... The two-pronged test is still real interest, not being an intermeddler and reasonably harm, but those factors are interpreted differently. Ritchie prevailed. The harm for Ritchie was, he didn't want to make a... He wanted to make a statement that spousal abuse was against public policy. And so that was the believed harm in Ritchie, and this court found that persuasive. And he was a member of the public that was within that group that expressed that harm. Well, I mean, he wasn't a victim of... I mean, he wasn't involved in any direct or... He personally was not involved in... As a member of the general public, he was found within that group that considered this mark to be harmful. That's correct. But again, I'm trying to extract from what is in the record here and what is set forth in your pleading, where there is harm to your client, and I'm having trouble finding it. Yeah, sure. Well, okay. Again, the two places where there's harm to the client, one, I think the fact that there is a fraud on the trademark office, that that's allowed to be essentially sanctified and blessed, I think is a harm to everybody. And I do think that the two-prong test for fraud is going to have different... Should not be reduced to a two-prong test for commercial... For a competing likelihood of confusion and opposition. I do think that is a solid argument. But I also think... Is it your position that, say, a citizen of France believes that a registration was obtained fraudulently, let's say this citizen doesn't do any business anywhere in the world, just has a sense that, you know, this mark was obtained fraudulently, has standing to file a petition? The law currently does not provide for that. I think that's a better alternative than saying you can't whistleblow fraud on the trademark office unless you're in business in the U.S. I think that's not the way global commerce works. I also think it's not the way you want... I mean, someone needs to protect the sanctity of the trademark office. And in this case, you have some pretty flagrant false statements. I mean, this mark was... Let's say we disagree with both polls, right? You're trying to create opposite polls here. Yes. And now we're trying to figure out where do you fall inside those opposite polls. Yes. I appreciate that, Your Honor. I... Can you please get us there? Okay. That's what I was... I appreciate that, Your Honor. I think the combination here of fraud, and I mean, you can get into detail what the various fraudulent statements were, coupled with the prosecution history of linking all these activities together. I mean, the appellee is now saying, all right, it's outside the United States, this is irrelevant. Well, when they were trying to get the mark approved, outside the United States seemed to have a lot of relevance. And so... Let's go back. How is Netto's suffering? Netto's suffering because it's hampering... We've been involved in litigation. There's other markets that we're afraid of going into, frankly, because we don't know if this market's registered. There's every reason to believe, given their past conduct, when they didn't have a registration, that they're going to go back into these countries. So they have... We've got a U.S. registration, and they're going to start to try to bully other companies around. I mean, they've done this... They've asserted... They've asserted one Cintron mark user in Europe would have been a... Must have been a distributor of theirs, and they sent a threatening letter from their European attorney. They made false statements about the status of their applications in Australia. Well, if they're making all these bullying maneuvers around the world, even before they had the trademark, it seems like it doesn't matter one way or the other whether they have a registration here in the United States. They're going to try to, I don't know, suppress competition around the world by making all kinds of allegations. But that's... But then you're saying... So then if the fighting is going to happen regardless, then the harm is, you're going to make my client fight when they have a U.S. trademark as opposed to not having a U.S. trademark. Right now, we have the ability to say, look, they don't have a registration, but if the mark is registered, they will have a registration. So my client is harmed because you're arming the opposition. How does it arm them? Well, I mean, do I think these arguments necessarily... I mean, I'm not an expert on Nigerian trademark law. I do, however, know that the appellee filed an opposition in Nigeria based on these allegations about having a U.S. mark. And the trend... But they lost, right? Well, they lost in that one. There's somewhere they may have... They successfully registered the mark in Canada. There's... But they're the ones who introduced this. I mean, in other words, look, if they had never said in these statements all this global activity, all this double bootstrapping back and forth, and my client was just a Nigerian company doing business in Africa, and they never... We wouldn't be here today. But the appellee is the entity that decided to play this double bootstrapping game. Going to different countries and saying, hey, we've got U.S. rights, and the U.S. will say, hey, we've got global rights, right? And just doing whatever they can to maximize their ability to push around my client's and others, they're the ones who opened that door. So I'm saying don't close it now. I mean, don't let them... Now that they've got... Because remember, these marks were rejected eight times. Eight times. Can you just turn down the volume a little bit? Oh, I'm sorry. I'm sorry, Your Honor. It's smidge. I'm a... Okay. Please, keep going. Anyway, so... But with a smidge. I appreciate the allowance on that. Okay, please. So eight times the mark was opened. because it was a surname and because of no acquired distinctiveness. And so to prevail, they had to make false statements about it not being a surname. They said that, you know, we're not aware of anyone involved with the company who has the surname of Cintron, and it turns out one of the owners is a musician who in an interview said, yeah, the product's named after me. I mean, pretty blatant false statements. And they made these statements to get it allowed. So now that, you know, we've let the appellee, you know, make these statements in order to get the registered... To get the approval. And now they're saying, oh, this international stuff doesn't really matter, but it did before. And so you asked about narrow line drawing. My point would be the best way to draw the line is to say, if someone opens the door on, you know, some activity, they shouldn't be allowed to now close the door by saying, oh, that's outside the U.S., because they're the ones who opened the outside the U.S. door in the first place. And I will reserve the rest of my time for rebuttals. Okay. Thank you. Is it Mr. Reno? Reno. Okay. Mr. Reno, please go ahead. Good afternoon, your honors. May it please the court. I want to focus on the real interest part of the test. Because in order to bring a trademark cancellation or opposition action, you have to have a real interest, right? That's a direct and personal stake. And that real interest must relate in some way to the United States marketplace. We discussed the Ricci case. The Ricci case was a United States citizen who had an interest in values that existed within a certain group of the community of the general public in the United States. If, as Judge Lynn pointed out, he was a French citizen, I don't believe he would have had standing. We have a similar situation here. They're attempting to challenge my client's trademark application because of a claim of fraud. But they have no interest in the United States market. And they admitted three things that I think are fatal to their standing claim. They admitted that they don't use the mark here. They admitted that they haven't applied for protection here. And they admitted... They didn't get on the supplemental register, I thought, which was the number... Well, that was after the summary judgment motion was decided. They filed for that. At the time, the record before the TTAB was they never used the mark, they haven't applied to use the mark, and they had no intent whatsoever of using the mark in the United States. And then they lost and they tried to create standing by filing this application, which was later abandoned. So is it your position that any impact has to occur to a company, to an opposer's interests in the United States? It has to... I'm just trying to imagine what if there was a company in Toronto or Vancouver, and maybe there's spillover effects if some competitor has the same trademark rights here in the United States. You're saying that Toronto company wouldn't be able to come in and file an opposition under any circumstances? Yes. If all of its commerce was only in the United States? Well, yes, unless... What if they have a lot of customers in Buffalo? Well, then... But then there's an interest that's invoking the United States marketplace, invoking United States commerce, because those customers are now United States citizens. They're purchasing things from this Canadian company. But what if they're doing their purchases in Toronto? Well, that's similar to the... I believe that's similar to the Corporacion Habanos versus Rodriguez, I believe the case was. It was one of the cases that were cited where it was a Cuban cigar company, and they couldn't sell in the United States because of the embargo. But they had standing because they... One of the reasons they were found to have standing was they advertised in trade journals that were sold to people who lived in the United States. So United States consumers would be confused, because if they're purchasing Cuban cigar or cigars from this company in the United States that had a similar mark, they would think maybe they were purchasing these Cuban cigars. The statute, though, Section 13 of the Lanham Act, says any person who believes that he would be damaged by the registration, et cetera, et cetera. Correct. It doesn't say any person who believes he would be damaged by virtue of a U.S. activity or any person doing business in the United States. There's nothing that restricts that to the United States, correct? There's nothing in the text of the statute, but the Lanham Act Statement of Purpose states that it regulates commerce within the control of Congress. And what they're asking is what Netidos is asking the TTAB to do in this court, they're asking this court to regulate commerce that's occurring around the world that will never exist within the United States. So the Lanham Act can only regulate commerce within the control of Congress. And Congress doesn't control commerce within Nigeria or any other country they may someday end up expanding to. I guess going back to my fact about a Toronto company, it isn't advertising in the United States, but people in Buffalo know about this Toronto company and they want to go buy their shoes or hamburgers or whatever it is over in Toronto. And then they see that someone's about to get a mark here in the United States that would confuse their Buffalo customers. Are you saying that they wouldn't have standing to oppose that trademark? Even though they don't sell in Buffalo, they don't advertise in Buffalo? Right. I believe under that fact scenario they would have standing because there is confusion that is occurring within the United States marketplace. There's United States citizens that are being confused by this mark. Netidos hasn't alleged that United States citizens are going to be confused by the registration of this mark because of some spillover from Nigeria, which is halfway around the world. So, as I understand it, Netidos was arguing that your side is making some arguments about a distribution agreement. Correct. And the arguments revolving around the distribution agreement are predicated on your intellectual property rights and you're trying to enforce your intellectual property rights. And you're making certain arguments about Netidos' position within that agreement. Correct. And the fact now that you're about to get a US trademark, doesn't that somehow implicate their position in all these litigations? No, I don't think it – actually, I don't think it changes anything because with or make the distribution agreement argument. And the rights under the distribution agreement weren't really related to United States marketplace. They were really related to Nigeria. The claim was that they were our distributor in Nigeria. And that because they were our distributor in Nigeria, we were the party that actually had the rights. That was really the argument that took place in Nigeria. Okay, so when it comes to the distribution agreement, the scope of the dispute is limited to Nigeria because that's the territory the agreement governs. Correct. Yes, the way the distribution agreement was set up was that Cintron entered into a distribution agreement with a company called Vidosi Enterprises or something along those lines, but it was Vidosi. Vidosi then, the way we understood it, subcontracted with Netados to distribute what really were our products, or at least we thought they were distributing our products. And then Netados went and tried to register the trademark in Nigeria. And our argument was that they are essentially a subcontractor, a subdistributor of our distributor, so those rights should belong to us. And that was really the gist of the argument that took place before the Nigerian trademark law. And so that is really limited to just Nigeria. In order to have standing, the dispute should be limited to where the interest is invoked. That's really our argument. And the interest here, the only interest that was invoked belonging to Netados was invoked in Nigeria. In order to create standing, they made this third-party argument that TTAB held it didn't create standing. What they argued was that they had these trading partners that had applied for trademarks in the United States that they may someday enter into a deal with. But first of all, the trading partner is the party that's the real party of interest, and that would be the party that should have filed the petition to oppose the trademarks. And second, you can't – this court has held in the Colony Foods case that you can't invoke a third party's interest. You have to have a direct personal stake. Third-party interest is not a direct personal stake in the outcome. So if this court were to allow this third-party argument to take hold and give standing to Netados, what essentially would happen is we would, I think, eviscerate the standing requirement because any party could say, well, someday I might enter into a contract with a third party that would like to distribute these products in the United States, and therefore they would then create standing. I don't think that that argument has any merit to it. So that's really the gist of the issue, Your Honors, is in order to have standing, you have to invoke an interest that's within the control of Congress, and Congress does not control worldwide rights. And there's also an interesting analogy there. The TTP has repeatedly held that a party cannot seek to oppose or cancel a trademark based off of having a world-famous mark. There is no mechanism under the Lanham Act that recognizes world-famous marks. In order to seek to cancel or oppose a trademark based off of a world-famous mark, you have to first file an application for registration of the trademark based off of your foreign registration and have it rejected. And once that occurs, then they would have standing. And in order to do that, you have to, one of the requirements to file a trademark that way, a trademark application in that way, is to state that you have a bona fide intent to use the mark in the United States, which they can't do. So what they're really trying to do in another way is to, I think, circle around that world-famous issue and claim, well, you know, they argued the world-famous thing, and we can argue it here, but at least in the United States, world-famous marks aren't recognized as enough to create standing. Like I said, you have to file that application. What if, hypothetically, Mexico had a rule that said anybody that can get a trademark in the United States, presumptively, you can get a trademark in Mexico? And then Net-A-Dose is doing business with that same mark in Mexico and now is very nervous because now they can see that they believe their potential trademark rights will be disrupted in Mexico. Would they have standing then to come in and try to oppose you here in the United States? I would say no because, again, that's really just invoking Mexican commerce. It's not invoking United States commerce. The Lanham Act, you know, trademarks are territorial. They're not global. And the Lanham Act can only go as far as Congress's power to regulate commerce can go, and that is as far as the territories of the United States. And if there's no other questions, I surrender the rest of my time. Thank you. To be clear, the appellant is not requesting that Congress regulate commerce outside the U.S. We're simply saying that it is permissible to have the TTAB conduct itself in such a way that factors outside the U.S. are included in what happens here. We have statutes in this country about foreign bribery practices where if I go to some country and I bribe government officials to get a contract, there is ramifications in the United States. So the idea that this is somehow outside the bounds of congressional power or the power of the Lanham Act is not correct. I think it's very illustrative. When asked to define kind of how you would – when the appellee is asked to define how you would measure or where the impact has to be, he said it has to be confusion in the U.S., confusion in the U.S. Why the word confusion? There was no confusion in Ritchie. Confusion is only if you're opposing a mark based on a likelihood of confusion, a competing mark. This is an example of where the appellee is reading – is essentially grabbing onto this whole different plank of jurisprudence, the competing mark, which is a different basis of opposition, and then bringing that over to where it's not applicable. It wasn't – there was no confusion in Ritchie. We don't have to have confusion to oppose a mark based on a fraud. And it doesn't have to be confusion based on a surname as well. So there is – that construction of requesting that there be confusion in the U.S. is contrary to Ritchie, which is the closest precedent I think we have here, and that is that for different bases of opposition, you have different – the application is going to be different on those two broadcasts. And I think that that is – that that's a clear result of Ritchie. I also want to point out that this issue of the distributorship agreement was actually raised in a letter from European Council to the same entity in Europe. So it's not limited to Nigeria. It's not even limited to Africa. It is – it's not – this distribution agreement is a global framework that CBG uses, the appellee uses, to kind of push these companies around. And I also – one other factual issue. The – in deposition testimony with the Vidozzi Limited, one of the owners, or I was going to say the father or the son, admitted that all the direct activity of the appellee was in the U.S. and that all their IP rights in foreign countries all based on their U.S. assets or their U.S. activities. So they admitted in deposition that any IP rights they have outside of the U.S. are contingent upon the activities and the rights generated in the U.S. And so that's why in this case, if you allow the registration to go forward, then you are arming a party that's engaged in fraudulent statements to then go around the world and kind of reignite litigation that we'd rather not undergo. But I do think that there's a way to divide the lineup that you don't have to open the door to every opposition. And I do think that the estoppel argument, the prosecution history argument, is a way to do that. I think that if someone is going to make false statements in a way that involve other parts of the world, that they should not be allowed to later deny standing to a party because some of these activities happen outside the U.S. And I think that's a very incremental, non-radical way to provide justice in this case. And if there's no more questions, I think we can move on. Okay. Thank you very much. The case is submitted. All rise. The Honorable Court is adjourned from day to day.